Good morning, Your Honors. My name is Scott Poynter. I'm from Little Rock, Arkansas, Mountain Home originally. I represent iSquare Management Company and Arkansas Knoxville Hotel, the appellants in this case. Judge Loken, you were talking earlier about a case being decided on the law. This one's going to have to be decided on facts. The facts are going to be really important to this appeal. The posture of this case was this was a motion for summary judgment by the defendants. I hope we don't have to find any. No, sir. The issues raised have the facts there. So I'm going to be talking about facts for the most part this morning. Thank you for allowing us to have oral argument because the concept of a special relationship, well, I've told somebody before that I thought it was spongy. There's not a great deal of development of what that is, at least within the Arkansas appellate courts or within the circuit. Which do you think the correct legal standard to apply is? Is it the Stokes factors or is it the Bulow factors? Well, the way that I'm reading the decisions is all that is required for the establishment of a special relationship is that it be something more, those are the quotes of the opinion, and I think that's Bulow, something more than special standard relationship. I have to stop you. That's a quote from Dicta in a New Hampshire case set as the starting point for the court proceeding. That's not, I don't read that as law. First of all, it's an intermediate appellate court. I understand. Stokes is a high court, but that was Dicta from a New Hampshire court. The Bulow court, the Stokes court, and I think Judge Brooks in the Western District of Arkansas talk about the factors. We certainly go through the factors in our briefing, but there isn't a clear definition, it doesn't appear to me at least, Judge Coates, about what a special relationship is other than it's not standard. So you don't think Stokes or Bulow are controlling, control our analysis? No, I think that they talk about factors and they specifically say, in other words, lean towards finding the special relationship. For example, I think it's Bulow that talks about promises being made of higher degree of skill, or promises being made as to certain experience. And Bulow says those facts are factors to be considered as to whether there's a special relationship. I kind of thought Mann's was the most important of the three. What did you think about that? Again, it's the Supreme Court and it specifically purports to follow Stokes, but with a little more development, so to speak. It might be, but I... How do you distinguish Mann's? Because if we just look at our reply brief, there are over seven pages with 28 separate factual points on what we believe are the facts in this case that give rise to a finding of a special relationship. And looking at the case law, too, I think it's important that, for example, Judge Brooks in writing in the Warren v. Holland decision says this is a fact-intensive issue that is typically left to juries. And you see that also being said, and some other opinions around the country, not Mann, not Bulow, and not Stokes. They don't say that specifically. But there's significant other case law saying it's not a jury question. Do you agree with that? And I think those cases predate Warren and post-date Warren. I do disagree, because when I did research around the country, it seemed close to me that the judges, by and large, were saying... Well, I'm talking specifically in jurisdiction here. In terms of what? In Arkansas. But you're talking specifically about what? About Arkansas. I mean, Warren is out there, and you rely on it, but aren't there cases before and after Warren that disagree with it, or at least follow a different path? I think they don't disagree with the analysis. I think they say that the facts of our case are different and don't rise to that level. I think our case is more in line with the Western District of Arkansas case, because I think our facts... Well, I think, one, we got more facts, and two, I think we've got better facts. From the start, we didn't go out looking for a new insurance agent. My clients were well-established. The I-Square Management Company had been around for years. It had been doing its work in terms of managing hotels, constructing new hotels, remodeling old hotels, and then managing them for a number of years. They had a friend as an insurance agent in Pine Bluff that provided all their insurance needs as their agent. What was viewed by Stephen LaFrance, who was an investor in I-Square, was that there was a web of complexity in that having each project separately insured. So when Mr. LaFrance sells USA Drug, his insurance agent says, well, can you help me create some more income? Let's go to the facts. I find the most telling facts here are the lack of involvement of the agent and the agent's relationship in the Knoxville project. The way the involvement came, as described in the opponent's brief, I find that to be a very strong scenario suggesting something other than the kind of special relationship that would have created an affirmative duty in that situation. I have two things to that. One, I think, and I called it spin in my reply brief, that was their inference from certain facts that they like in that the guy... Wait, the creditor's going to the general contractor about the insurance got it all started, right? No, it's actually... It wasn't in response... And then Liberty Mutual comes in, which probably had, after the fact, the greatest exposure here, and somehow provided all this help in your attempt to create a special relationship, when in fact the scenario for what was insured, what everybody thought was insured by Liberty, and they said, oh, no, it isn't, was not at all. It wasn't known to the agent. Let me answer your question directly. Number one, we're entitled to the inferences here. Number two, with respect to the Knoxville project, number one, the lender... Wait, you're entitled to inferences what? As to the facts, we're entitled to inferences as to what those facts reveal on a summary judgment motion where we're the defendant to that motion. The district court must give us the benefit of the doubt, if you will, and instead, this district court disagreed with us. But I want to answer the factual question specifically as related to Knoxville. Number one, it was the lender that wanted the builder's risk insurance. It was a requirement of the lender. Two, in the prior projects that I-Square management had, which had the same general contractor, we had builder's insurance in place in many of those situations. Three, I-Square put Nicholas Hall of McGriff in touch directly with both the lender and the general counsel to discuss this issue and look into this issue and advise I-Square on whether it needed builder's risk. That, Your Honor, is involvement in the project. So maybe he didn't physically travel to Knoxville, but he was involved in the project and he was involved in prior projects with I-Square, specifically the Northwest Arkansas projects and the Memphis project. So there was involvement even though there was not physical trips to Knoxville. After he talked with and communicated with the lender and with the general counsel, he asked for the contract itself, the remodeling contract. He received that. He also asked for the warehouse insurance policy, and he received that. That also is direct involvement with the project. He then advised the client, I-Square, in writing, you do not need builder's risk. The policy that we put in place for you and that we recommended in August of 2018 covers all perils. Now, Judge Loken, you mentioned the Liberty Mutual investigation after the flood. They interviewed Mr. Hall, and there's a memo, we call it the McGooey memo in our briefing, where he says, one, after he interviewed Mr. Hall that he understood that the FF&E was in a warehouse off-site, and two, that he understood, quote, assumed that the warehouse insurance would cover any loss. So he made a mistake and advised his client the wrong way. But the crux of what's in this appeal is whether there was a special relationship. I kind of analogize this between general causation and specific causation. Everything that I went through with respect to the project in everything that sets up the relationship itself, going back to the fact that I-Square was targeted, that it was solicited, that it was made promises of increased skill, expertise, sophistication, and changing the insurance business of I-Square to one global policy to cover everything is the general nature of the relationship. In all, the totality of the circumstances, that is a special relationship. Our client relied on Mr. Hall's advice. I don't see an Arkansas case that supports that. With respect- I see a lot of maybe dicta, maybe not dicta, if actually distinguishable cases to the contrary. I think if you parse out certain things, for example, they say, well, this is only a two-year relationship. It should have been longer. So there are certain factors that weigh against special relationship, but there are a lot of things that we go through, particularly in the reply brief in the timeline that we created, that states the facts and then provides where it is in the law, whether it's the Bulow case or one of the other decisions. We are tying facts to where certain decisions from our appellate courts in Arkansas have said, way to the advantage of a special relationship being found. You keep coming back to the Rule 56 standards, but this is an issue of law. I disagree because I think it's a fact issue, and I'm not trying to upset you, Your Honor. Obviously, like many issues of law, it turns on facts that may or may not be disputed, and the dispute may or may not require evidentiary development, but they're not for a jury at trial. Well, the decisions, and even Judge Moody's decision says, can reasonable jurors find a special relationship on these facts? So I think everything turns on the facts, and the factors within the decisions that Judge Cobes had been talking about. We think that we meet the factors. We apply the factors in our reply brief to each factual circumstances within page 3 through about 11. So we're trying to tie the law to those facts, Your Honor. I'm into my reserve time. I'd like to reserve the rest of it, Your Honor. Thank you.  Yes, Judge, good morning. Is it still morning? Can we count it? May it please the Court, Kristen Jones here with my colleague Brad Sears for McGriff Insurance Services, and I, too, thank the Court for having us here today. I would like to jump in with what Judge Loken started with. Let's look at the facts, since that is really what Mr. Poynter wants to talk about. And I would encourage the Court to really look at what they have presented before you. And I'll back up and say that I actually do agree that not only is Stokes controlling, and those three factors, but even Buelow, even with the additional things and points that it discusses, it's applying Stokes and applying the prongs of Stokes. And both Stokes and Manns are the two prevailing Arkansas Supreme Courts on point that this Court sitting in diversity jurisdiction must follow. So the first point that Mr. Poynter pointed out is that McGriff reached out to Buelow to reach out to I-Square for this business. This, first of all, there's no authority that even hints that a broker's pursuit of a client can trigger a special relationship. And if that were the case... I don't see why I just don't say that. It doesn't matter. Who reached out? That's the way the marketplace works. I couldn't agree more, Your Honor. Thank you. And if that were the case, I think the exception would swallow the rule, which is also what the trial court Buelow found as well. Also that they were highly skilled experts or that they could do a better job than the client. Sounds like puffery. We heard a lot about puffery earlier, yes. Again, a standard sales pitch, I don't know an agent that would say, eh, we're average and probably wouldn't do it as well as the other guy. So again, even under Stokes, we're not looking at... that does not fall under one of these prongs. What kind of case is this? Is this a contract case or a torch case? This is a negligence case, Your Honor. I'm sorry? This is a negligence case, Your Honor. They've alleged that we had a duty... But the scope of the duty is determined by the nature of the relationship, which is essentially a contractual one, right? Yes, Your Honor. The question is, what was the nature of the deal? What was the nature of the relationship? At bottom, we've got a contract problem. Sure. And in this case, there are... the record is clear that there are no terms in the agreement. There was no... Why wouldn't it just be a breach of contract? I guess that's just the way they pleaded it. Yes, Your Honor. I have some... My mind keeps going to the notion that maybe what's going on here with a special relationship idea is a kind of quasi-fiduciary situation or something like that, which raises tort-like considerations. But I guess it doesn't really matter how you characterize it. The whole point is, what was the deal, right? Right. And here, they're trying to place a duty on their insurance agent to ensure, E-N-S-U-R-E, that a piece of property, and let me be very clear about this, we're talking about a piece of property, an off-site storage warehouse that McGriff knew nothing about. And I can get into some of the facts about that as well. But whether or not that McGriff had a duty to ensure that this separate property was insured against natural disaster, in this case, a flood. And the law in Arkansas and... Documents could create that specific duty for one project. Absolutely. I can't testimony. Well, your Honor, testimony, first of all, a self-serving affidavit saying that they believed there was a special relationship is clearly insufficient. No, no, no. I mean, if I-Square had come along when the lender went to the general contractor for the Knoxville contract and said, I'm worried about the insurance, what's the status? I-Square could have gone to McGriff and said, will you assume the duty to track this down and resolve it? Correct. Now, Judge Arnold says, whether it's almost quasi-fiduciary, but in any event, now there's a contractual obligation to do that. Yes, and there's even case law that says that you can assume that duty. And we acknowledge that the Bollinger case, this is a 2018 case from the Arkansas Court of Appeals. That was a case where the agent was presented with an issue and the agent said, yes, we will handle it. And the court said, okay, this was, even though there is not a standard duty or there would not otherwise be a duty, the agent actually assumed the duty here. So why isn't there a fact dispute on that here? Because there is no evidence that they came to McGriff and asked for them to investigate the insurance on the warehouse. In fact, there's contrary evidence that I think you indicated- Should we have business risk insurance on the warehouse? Oh, yes, to address that. Why doesn't that get them past summary judgment? To be clear, they asked whether or not they should have business risk insurance on the Arkansas Knoxville Hotel. This is why I want to be very clear- Okay, what's the site for that, for the distinction? I know that becomes significant. Sure. Let me see. In my shorthand, I'm going to say, Arkansas. Shorthand notes, let me see if I can pull. Perhaps my colleague can grab that for us while I continue. They asked for whether or not there was builders, whether or not they should obtain builder's risk insurance on the hotel, the hotel project. Well, the hotel project maybe is a little different. I'm sorry. Only question asked and answered was whether builder's risk was needed, and here's the quote, for construction being done at the Knoxville Marriott. There's that distinction, but I also- Can you give me the site? I don't know what you were reading from. Here we go. It is in the McGriff Appendix 210 to 212. This is the email from Shosh Goyle, who is the I-Square principal, and that was his distinction, but he was distinguishing in that email between his request for builder's insurance between the hotel and the warehouse. Thank you, Your Honor. Thank you, Brad. What's peculiar here is this focus on business risk versus property coverage. It seems if the Liberty people had been asked and said, you have property, you have fire insurance for the hotel but not for the warehouse, then the easy answer would have been, well, do an addition to the policy, add it to the policy. Absolutely. They could have easily amended and added it to the Liberty mutual policy. I know business risk coverage is a little more indifferent, but why is that even involved here? Well, I'll let- Well, no. Why? I-Square just asked about business risk? Yes. They had had two prior ground-up constructions, I believe in Northwest Arkansas, that their prior agent had placed builder's risk insurance on. My understanding of the record is that the contractor, when they began the renovations of the Knoxville Marriott Hotel, and again a distinction between whether or not the prior hotels were ground up and this hotel was simply a renovation, and all that I-Square asked McGriff was to see if the contractor was willing if they needed builder's risk insurance on this renovation. Mr. Hall talked to the contractor and he talked to the Liberty Mutual agent- I understand why a contractor's interested in what's being constructed. That's what his lenders worried about. In the warehouse, that's operational. That's post-hoc. But how does business risk get into the conversation between I-Square and Liberty Mutual? McGriff? My understanding is that the contractor wanted to make sure the construction project was adequately covered. The contractor asked about business risk? I believe that that is how the conversation, and I welcome clarification on that point, but really what is extremely critical here and to note is not only would, as you pointed out, if they had known about the warehouse, they could have added it to the Liberty Mutual policy. There would have been no reason to get builder's risk insurance. They being who? Being I-Square. No. I'm sorry, if McGriff had known about the warehouse, if I-Square had told McGriff about the warehouse, then they could have added it to the Liberty Mutual. I-Square presumably knew. I-Square presumably knew, and that's where I was going. They actually then looked to the contractor, Mr. Shively and CCG, and then a woman by the name of Shelly McNeely, who they actually contracted with to facilitate the warehousing, and then she entered into, or through the general contractor, entered into a contract with Armstrong Relocation Services, and each time that I-Square needed a certificate of insurance or needed any sort of insurance confirmation on the warehouse, they went to Ms. McNeely and Armstrong, and that, I think, is a real nail in the coffin because even if we had known about the warehouse and had this duty that they're trying to put on McGriff, if we had inquired, I-Square would have told us that the insurance was handled elsewhere, and this goes actually to, we presented two additional points or ways that this court could further affirm the trial court's judgment, and this goes to a causation point that how could we have caused this, their ultimate damage in this, if they were, even if we had known about the warehouse, that they were looking to another party to certify their insurance. We could not be, we don't have this exceptional duty beyond doing what a special relationship gave you a duty to find out that you were looking to the wrong people to answer the FFE insurance question. But if you look at, we cite Wagner v. General Motors, and this really brings home that that duty is not limitless. We only would have to reasonably advise on insurance coverage matters, and reasonably investigate facts applicable to such coverage. And so we would not have had this unlimited duty to ferret out, you know, oh, is there enough coverage on the warehouse? Should we see the traveler's insurance policy? Could we, that the case law simply does not require us to really go that far above and beyond. In your view, is this analogous to the discussion in Mann's about whether the banking special, alleged banking special relationship extended to or spilled over to the bank needing to be aware of insurance, an insurance problem? It seems to me the court was saying that. Your Honor, I don't have. A Mann's argument is one of implied trust grounded on a special relationship based on course of dealing, where proof falls short of substantial evidence which is necessary to ward off directed verdict because the duty was based on a banking relationship. Correct and in Mann's, the court specifically says that reliance is not enough, right? Reliance that Mann's granted directed verdict on that exact issue. And they link special relationship to Judge Arnold's point about, it sounds like a breach of some kind of fiduciary duty. That's correct, I agree. Mann's links the two concepts. I agree with that assessment. I see that I'm out of time. We have another point before the court, the lack of proximate cause due to McGriff's failure to read the contract. We'll take that on the brief. Thank you, Your Honor. Appreciate it. There's three points I'd like to make. Number one, she ended about the contract. She said our client never read the insurance contract. That to us is hypocritical because their client, Mr. Hall specifically, asked for the building contract which provided for offsite storage and he said he never read it. So, the documents that he had specifically provided for offsite storage and a warehouse. Two, warehouse is clearly an issue of fact. They're saying that Mr. Hall did not know about the warehouse but the McGooey memo that I referenced in my opening... Give me a cite for that. You said a lot of names that I don't understand. Exactly. It's dated in April of 2019. We referenced it on page 10 of our reply brief. In the appendix it's at 197, the specific document number for the district work below. But that memo, Your Honor, talks about how Mr. Hall knew in the fall of 2018 that there was offsite storage in a warehouse and he, quote, assumed that the warehouse's insurance was going to apply for that inventory. So there is a clear question of fact. Our Exhibit A is the McGooey memo to the jury because it lays out that he knew about the warehouse and he assumed that the warehouse's insurance would cover. Judge Arnold, I think it was you that talked about assumption of duty. It may have been Judge Loken. In the specific context of the Knoxville project, Mr. Hall was asked, do we need builder's risk insurance? Judge Loken, the lender, had it as a requirement to have builder's risk insurance. So it came out or grew out of that context. The Northwest Arkansas project and the Memphis remodeling project all had the same GC that was the GC for Knoxville. He said, hey, I've got builder's risk on my projects in Northwest Arkansas. Do I need builder's risk here? So the lender and the GC wanted builder's risk. Guess what? Nick Hall communicated with both of them directly and participated in the project, assumed the duty, the chore of advising his client, do you need builder's risk? He chose to take that on and he advised the client, don't buy it. Now, why is that just a separate deal without, forget about special relationship, just a separate contract that you could have this actionable? You know, Your Honor, I think that contract could be a separate theory here, but it was, this case was pled more than a malpractice case. I'm just trying to get to Occam's Razor here and get to the simplest solution. I just don't, but in any event, we'll deal with it the way it's pleaded. Thank you, Your Honor. Any other questions? Thank you. The argument's been very helpful in clarifying at least the facts. We can't clarify the law, but we can work on that now. Thank you, Your Honor. Thank you. Or at least in this case, the Arkansas Supreme Court ultimately controls the law that we take it under advisement.